Filed 5/15/14  P. v. Garza CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F065675 |
| Plaintiff and Respondent, | (Super. Ct. No. BF135393A) |
| v. | |
| ALBERT FLORES GARZA, | **OPINION** |
| Defendant and Appellant. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Sidney P. Chapin, Judge.

Chris R. Redburn, under appointment by the Court of Appeal, for Defendant Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Kelly E. LeBel, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Appellant Albert Flores Garza was convicted of driving while under the influence of alcohol four times during the period of 1994 to 2006. On January 17, 2011, he drove while intoxicated again. Appellant was traveling more than 75 miles per hour in a SUV when he failed to yield at a stop sign and struck a pickup truck. The truck's driver and a passenger in the SUV were fatally injured.

Appellant was convicted after jury trial of two counts of second degree murder, two counts of gross vehicular manslaughter and driving with a suspended or revoked driver's license. (Pen. Code,[1] §§ 187, subd. (a), 191.5, subd. (a); Veh. Code, § 14601.4, subd. (a).) Enhancement allegations that appellant suffered prior convictions for driving while intoxicated and served a prior prison term were found true.[2] (§§ 191.5, subd. (d), 667.5, subd. (b).) Appellant was sentenced to two consecutive indeterminate terms of 15-years-to-life imprisonment plus a one year determinate term.

Appellant contends that the trial court prejudicially erred by: (1) excluding certain testimony during the hearing on a suppression motion; (2) denying the suppression motion; and (3) failing to give CALCRIM No. 626 sua sponte. Appellant also argues that defense counsel was ineffective because he did not request CALCRIM Nos. 414, 625 and 3426. None of these arguments is convincing. The judgment will be affirmed.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Pursuant to Penal Code section 12022.7, subdivision (g), the court struck true findings on special allegations that appellant inflicted great bodily injury upon non-accomplices.

## FACTS

### A.    Prosecution evidence.

Shortly after noon on January 17, 2011, Hans Marlette[3] was traveling in a Dodge Ram pickup truck (the pickup truck) southbound on State Route 43. Meanwhile, appellant was driving a GMC Envoy sport utility vehicle (the SUV) westbound on Riverside Street, which intersects State Route 43. The SUV's front passenger seat was occupied by 19-year-old Manuel Cantu. Cantu's mother, Noemi Cadena, was appellant's long-term girlfriend. Appellant failed to yield at the stop sign on Riverside Street at the intersection of State Route 43. He sped into the intersection and struck the driver's side of the pickup truck. Marlette and Cantu suffered fatal injuries and died instantly.

Appellant was removed from the SUV by emergency responders. Appellant was not wearing a seat belt. His legs were under the driver's seat and his upper torso was resting on top of Cantu, who was belted into the front passenger seat. Appellant smelled strongly of an alcoholic beverage. A 12-pack of Budweiser beer was on the SUV's rear floorboards; some of the beer cans were open. A bottle of Kessler whiskey was lying on the ground approximately five feet from the SUV's driver's door.

Appellant was transported to the hospital and treated for injuries sustained in the crash. A sample of appellant's blood was drawn at 3:50 p.m. to test its alcohol level, which was determined to be 0.15 percent. A criminalist concluded that appellant's blood alcohol level at 12:40 p.m. was between 0.180 and 0.225 percent. Cantu's blood had an alcohol level of .094 and tested positive for methamphetamine and marijuana.

There were no pre-collision skids on the roadway. Crash data retrieved from the SUV showed that it was accelerating when it struck the pickup truck. Five seconds before the collision the SUV traveled 71 miles per hour; one second prior to the collision

---

[3]    Marlette, an Ohio resident who was in California on a business trip, was a married father of a two year old and a pair of 10-month old twins.

it traveled 76 miles per hour. The brakes were not activated at any point during this five second period and the throttle was evenly applied. The SUV was inspected for mechanical problems; none were found. The brake pads and tire treads appeared to be adequate.

Juan Magallon was driving behind the pickup truck and witnessed the accident. Magallon told Shafter Police Officer Phil Yoshikawa that the SUV was traveling 80 miles per hour and did not slow down prior to impact. At trial, Magallon testified that the SUV was travelling 70 or 80 miles per hour. Magallon estimated that the pickup truck was traveling 55 miles per hour, which is the posted speed limit.

On January 20, 2011, Shafter Police Detective Chris Grider interviewed appellant. The interview was videotaped and played for the jury. Appellant said that he lived with his mother in Buttonwillow. On the night before the accident he slept in the SUV, which was parked outside Cadena's home in Oildale. Appellant said that when he woke up on the morning of January 17th, he was still drunk from alcohol he consumed before falling asleep. He drank some alcohol with Cantu and accepted Cantu's offer to drive him home in the SUV. Appellant said that he fell asleep and did not know why Cantu was on the road where the accident occurred or if Cantu ran the stop sign on Riverside Street. Appellant said the SUV did not have any mechanical problems.

## B.    Appellant's prior convictions.

Appellant was convicted on four occasions for driving while under the influence of alcohol during the period of 1994 to 2006. When he was sentenced for the latter two convictions he signed a form acknowledging that drinking and driving is dangerous to human life and warning him that he could be charged with murder if he drives while under the influence of an intoxicant and kills someone. Appellant did not complete court ordered education programs on substance abuse and driving while under the influence of alcohol. His driver's license was revoked in 1994 and he did not regain driving privileges.

**C.      Defense testimony**.

Appellant testified in his own defense.  He said that during the morning of January 17th, Cadena drove him to some grocery stores.  He drank "too much" beer and argued with Cadena about his drinking.  Cantu agreed to drive him home.  Appellant does not recall getting into the SUV or the circumstances surrounding the accident.  Appellant admitted that on January 17th he knew that he could kill someone if he drove while intoxicated.

Cadena testified that the SUV belonged to her and appellant never drove it.  During the morning of January 17th, she drove appellant, Cantu and Ilene Rodriguez to purchase groceries.  She purchased a 12-pack of beer.  Cantu and appellant drank some of the beer after they arrived home.  Cadena cooked breakfast and, after calling the others to eat, discovered that appellant and Cantu were leaving in the SUV and Cantu was driving.  She yelled at them to stop but Cantu sped away.

Alicia Garza, who is appellant's sister, testified that a day or two after the accident she and Rodriguez visited appellant in the hospital.  Rodriguez told appellant that he was not driving the SUV when he left in it with Cantu.

## DISCUSSION

**I.      The Suppression Motion Was Properly Denied.**

**A.      Facts.**

Appellant filed a pretrial motion to suppress the blood alcohol content results from the warrantless blood sample that was drawn approximately three hours after the crash.

The motion was heard on April 19, 2012.  Detective Grider and Shafter Police Officers Luis Pena and Phil Yoshikawa testified at this hearing.

Officer Pena testified that appellant's legs were inside the driver's compartment of the SUV and he was partially seated on the front center console.  Officer Pena detected "a strong odor of an alcoholic beverage" on appellant's breath.  He found a liquor bottle just outside the SUV's front driver's side door.

Officer Yoshikawa testified that he found several cans of beer on the SUV's rear passenger compartment floorboards. At least one of the cans was open. He spoke with Juan Magallon, who told him that the SUV did not yield at the stop sign and struck the pickup truck. Officer Yoshikawa informed Detective Grider of Officer Pena's observations and his own findings.

Detective Grider testified that when he reported to the accident site Officer Yoshikawa told him about the alcohol containers and the smell of alcohol detected on appellant's breath. Based on this information, Detective Grider decided it was necessary to obtain a sample of appellant's blood. Around 4:30 p.m., he contacted appellant at the hospital. A registered nurse drew a sample of appellant's blood and Detective Grider took custody of the vial. Before conducting the blood draw, the nurse told him that a blood sample had already been taken.

During cross-examination defense counsel asked Detective Grider if he requested a warrant for the blood sample. Grider responded, "No, I did not." Defense counsel queried, "Why not?" Grider answered:

> "Because I know there were, when I responded to the hospital to check on him and found out he was being treated, I knew that the amount of treatment, from talking to medical staff, would take some time, and therefore, under exigent circumstances, I knew that I didn't need a search warrant, that his blood, if he was driving a vehicle, that he was subject to provide that sample."

Defense counsel asked, "But you had the time to call in for a warrant if you wanted to, correct?" Grider answered, "Yes." The court asked defense counsel, "What's the relevance of that?" Defense counsel answered, "Goes to the exigent circumstances." The court said, "I get to decide if there's exigent circumstances, and I think the question's irrelevant and I'm going to sustain my own objection."

Appellant did not call any witnesses.

The suppression motion was denied without explanation.

6.

**B.    The motion to suppress the blood alcohol results was properly denied.**

**1.  The applicable standard of review is settled.**

"'The standard of appellate review of a trial court's ruling on a motion to suppress is well established.  We defer to the trial court's factual findings, express or implied, where supported by substantial evidence.  In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment.' [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 384.)

The appellate court may affirm the denial of a suppression motion "on a different ground than that relied on by the trial court.  [Citation.]" (*People v. French* (2011) 201 Cal.App.4th 1307, 1325, fn. 5.)

**2.  The good faith exception to the exclusionary rule applies in this case.**

One year after appellant's pretrial suppression motion was denied the United States Supreme Court decided *Missouri v. McNeely* (2013) __ U.S. __ [133 S.Ct. 1552] (*McNeely*).  *McNeely* held that the natural dissipation of alcohol in the bloodstream does not establish a per se exigency that suffices on its own to justify a warrantless, forcible blood draw in every case.  Yet, "the metabolization of alcohol in the bloodstream and the ensuing loss of evidence are among the factors that must be considered in deciding whether a warrant is required." (*McNeely, supra,* 133 S.Ct. at p. 1568.)  Consistent with general Fourth Amendment principles, exigency in the context of drunk-driving cases must be determined on a case-by-case basis in light of the totality of the circumstances. (*McNeely, supra,* 133 S.Ct. at pp. 1557-1568.)

Appellant argues that, applying the *McNeely* analysis, the prosecution failed to demonstrate any exigency for the warrantless blood draw.  He further contends that Detective Grider "did not act in good faith as that term is defined by the Supreme Court." It is not necessary to decide if the *McNeely* holding that the elimination of alcohol from the bloodstream does not constitute a per se exigency is a new procedural rule of law to be applied retroactively to this case.  Regardless of our conclusion on that issue, the

7.

police conduct in this case fell within the good faith exception to the exclusionary rule. (*People v. French, supra,* 201 Cal.App.4th at pp. 1324-1325.)

Until *McNeely* was decided, the leading United States Supreme Court case concerning nonconsensual blood draws was *Schmerber v. California* (1966) 384 U.S. 757. In *Schmerber*, the petitioner was involved in a traffic accident and transported to a hospital. He was arrested for driving under the influence of alcohol and a police officer directed a physician to take a blood sample. The sample was tested for blood alcohol level and the results were admitted at trial. The Supreme Court reasoned that because of the body's natural elimination of alcohol from the system, an arresting officer could reasonably conclude that the delay involved in seeking a warrant might result in the destruction of evidence. (*Id*. at pp. 770-771.) In *Cupp v. Murphy* (1973) 412 U.S. 291, the United States Supreme Court extended the *Schmerber* rule to uphold admission of evidence obtained from fingernail scrapings that were taken in the absence of a formal arrest. (*Id*. at pp. 294-296.)

California courts routinely applied *Schmerber* and *Cupp* to uphold warrantless compulsory seizure of blood for the purpose of a blood alcohol test where (1) the procedure was conducted in a reasonable, medically approved manner, (2) is based upon a reasonable belief that the person was intoxicated, and (3) the person was arrested, or there existed probable cause to arrest, for driving under the influence of alcohol. (*People v. Deltoro* (1989) 214 Cal.App.3d 1417, 1422-1426; *People v. Nieto* (1990) 219 Cal.App.3d 1275, 1277-1278.) It was recognized that the *Schmerber* decision "relied almost exclusively on the exigency created by the evanescent nature of blood alcohol and the danger that important evidence would disappear without an immediate search." (*People v. Trotman* (1989) 214 Cal.App.3d 430, 436.)

Based on the foregoing, it is readily apparent that the police conduct in this case fell well within the parameters of the "good faith" exception to the exclusionary rule. Appellant does not identify any pre-*McNeely* California decision suggesting that, in

8.

circumstances before us, a warrantless blood draw was legally impermissible. Detective Grider acted in accordance with existing legal precedent and with a reasonable, good faith belief that his actions were consistent with applicable law. There was ample evidence tending to prove that appellant drove the SUV while intoxicated. There existed probable cause to arrest him for driving under the influence of alcohol. The blood draw was conducted in a medically approved manner. Consequently, no "'appreciable deterrence'" would result from the application of the exclusionary rule in this case. (*Davis v. United States* (2011) ___ U.S. ___ [131 S.Ct. 2419, 2426].)

We, therefore, uphold the order denying the suppression motion and conclude that evidence of appellant's blood alcohol level was properly admitted at trial.

### 3. Exclusion of testimony that Detective Grider had time to request a warrant was harmless.

Appellant also contends that the trial court violated his constitutional due process rights by excluding testimony that Detective Grider had time to request a warrant. The claimed evidentiary error is harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 26.) As we have explained, when Detective Grider decided to proceed without a warrant he acted in compliance with existing legal precedent authorizing warrantless blood draws due to the exigency created by the natural dissipation of alcohol in the bloodstream. Whether the detective had time to request a warrant does not affect our determination that he acted reasonably and in good faith. Thus, appellant was not prejudiced by exclusion of this testimony.

## II. The Court Did Not Have A Duty To Instruct On Voluntary Intoxication Causing Unconsciousness.

### A. Facts.

Appellant was prosecuted for second degree murder on an implied malice theory. The jury was instructed on murder and the following lesser included offenses: gross vehicular manslaughter while intoxicated, vehicular manslaughter while intoxicated,

driving a vehicle while under the influence and causing injury, driving with .08 blood alcohol level causing injury, driving under the influence and driving with .08 blood alcohol level. The jury was not instructed on involuntary manslaughter.

## B.  Applicable legal standard.

The trial court is obligated to instruct on the general principles of law that are raised by the evidence. This includes a sua sponte duty to instruct on a lesser included offense when there is substantial evidence, viewed in the light most favorable to the defendant, from which a rational jury could conclude that the defendant committed the lesser offense and that he is not guilty of the greater offense. (*People v. Turk* (2008) 164 Cal.App.4th 1361, 1368, fn. 5; *People v. DePriest* (2007) 42 Cal.4th 1, 50.) A lesser offense is necessarily included within a charged offense if the greater offense cannot be committed without also committing the lesser offense. (*People v. Lopez* (1998) 19 Cal.4th 282, 288.) A trial "court is not obliged to instruct on theories that have no such evidentiary support." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.)

The de novo standard of review is applied to the failure to instruct on a lesser included offense. (*People v. Cole* (2004) 33 Cal.4th 1158, 1218.) If a trial court fails to instruct on a lesser included offense that is supported by the evidence, the error is one of state law alone. (*People v. Breverman, supra*, 19 Cal.4th at p. 165.) Such an error does not require reversal unless "an examination of the entire record establishes a reasonable probability that the error affected the outcome." (*Ibid.*)

## C.  CALCRIM No. 626 is not applicable.

Appellant asserts that "[u]nconsciousness due to voluntary intoxication is a partial defense which negates the mental state for murder, reducing the offense to involuntary manslaughter." Based on this premise, he argues the trial court had a sua sponte duty to give CALCRIM No. 626, which instructs that voluntary intoxication resulting in unconsciousness can reduce a charge of murder to involuntary manslaughter. This argument fails because, under current law, voluntary intoxication cannot negate a finding

10.

of implied malice.  When the killing is committed while driving a vehicle, the driver's voluntary intoxication cannot reduce his criminal responsibility to involuntary manslaughter.  (*People v. Carlson* (2011) 200 Cal.App.4th 695, 705-707; *People v. Ferguson* (2011) 194 Cal.App.4th 1070, 1082.)

The limited admissibility of evidence proving voluntary intoxication is governed by section 29.4, which was formerly codified at section 22.  (*People v. Carlson, supra,* 200 Cal.App.4th at p. 705.)  In 1995, former section 22 was amended to "preclude a defendant from relying on his or her unconsciousness caused by voluntary intoxication as a defense to a charge of implied malice murder."  (*Carlson, supra,* at p. 705.)  In relevant part, this statute provides:  "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought."  (§ 29.4, subd. (b).)  "[D]efendant's voluntary intoxication, even to the point of actual unconsciousness, [does] not prevent his conviction of second degree murder on an implied malice theory ...."  (*People v. Boyer* (2006) 38 Cal.4th 412, 469, fn. 40.)  Consequently,

> "It is no longer proper to instruct a jury ... that 'when a defendant, as a result of voluntary intoxication, kills another human being without premeditation and deliberation and/or without intent to kill (i.e. without express malice), the resultant crime is involuntary manslaughter.'  This instruction is incorrect because a defendant who unlawfully kills without express malice due to voluntary intoxication can still act with implied malice, which voluntary intoxication cannot negate, in the wake of the 1995 amendment to [former] section 22, subdivision (b).  To the extent that a defendant who is voluntarily intoxicated unlawfully kills with implied malice, the defendant would be guilty of second degree murder."  (*People v. Turk*, *supra*, 164 Cal.App.4th at pp. 1376-1377, fn. omitted.)

In this case, appellant's claimed alcohol induced blackout resulted from voluntary self-intoxication.  There is no evidence, and appellant does not assert, that his ingestion of alcohol was involuntary.  Therefore, CALCRIM No. 626 is not applicable and the trial

11.

court did not err by failing to give this instruction.  (*People v. Carlson, supra*, 200 Cal.App.4th at p. 708 [court properly refused to give CALCRIM No. 626]; *People v. Ferguson, supra*, 194 Cal.App.4th at p. 1085 [same].)

**III.   Defense Counsel Was Not Ineffective.**

### A.     The standard of review is settled.

"'A criminal defendant is guaranteed the right to the assistance of counsel by both the state and federal Constitutions.  (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.)'" (*People v. Lucas* (1995) 12 Cal.4th 415, 436.)

> "… The constitutional standard for determining whether counsel has failed to provide adequate legal representation is by now well known:   First, a defendant must show his or her counsel's performance was 'deficient' because counsel's 'representation fell below an objective standard of reasonableness [¶] ... under prevailing professional norms.'  [Citations.] Second, he or she must then show prejudice flowing from counsel's act or omission.  [Citations.]  We will find prejudice when a defendant demonstrates a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'  [Citations.]  'Finally, it must also be shown that the [act or] omission was not attributable to a tactical decision which a reasonably competent, experienced criminal defense attorney would make.' [Citation.]"  (*People v. Gurule* (2002) 28 Cal.4th 557, 610-611.)

The standard for judging counsel's representation is extraordinarily deferential. The appellant bears the burden of overcoming the strong presumptions that counsel's conduct fell within the wide range of reasonable professional assistance and that the challenged act or omission might be considered sound trial strategy.  (*People v. Lucas, supra,* 12 Cal.4th at pp. 436-437.)  Reviewing courts will reverse convictions on the ground of inadequate counsel only if the appellate record affirmatively discloses that defense counsel did not have a rational purpose for the challenged act or omission. (*People v. Zapien* (1993) 4 Cal.4th 929, 980.)  This is a difficult burden to satisfy on direct appeal.  (*Lucas, supra,* 12 Cal.4th at p. 437.)

**B.** **The omitted instructions would not have assisted the jury or affected the verdict.**

Appellant was prosecuted for second degree murder under an implied malice theory. The prosecutor and defense counsel both requested, and the court gave, instructions on alcohol-related lesser included offenses: gross vehicular manslaughter while intoxicated (CALCRIM No. 590), vehicular manslaughter while intoxicated (CALCRIM No. 591), driving a vehicle while under the influence causing injury (CALCRIM No. 2100), driving with .08 alcohol level causing injury (CALCRIM No. 2101), driving while under the influence (CALCRIM No. 2110), driving with .08 alcohol level (CALCRIM No. 2111).

"[T]he duty of counsel to a criminal defendant includes careful preparation of and request for all instructions which in his judgment are necessary to explain all of the legal theories upon which [the] defense rests." (*People v. Sedeno* (1974) 10 Cal.3d 703, 717, fn. 7.) Appellant argues defense counsel did not satisfy this duty because he failed to request instructions on intoxication when prosecuted as an aider and abettor (CALCRIM No. 404), the effect of voluntary intoxication on homicide crimes (CALCRIM No. 625) and voluntary intoxication (CALCRIM No. 3426). We are not persuaded.

Appellant asserts that "the prosecution in this case was required to prove more than implied malice in order to obtain a conviction for second degree murder. Murder of either degree requires proof of specific intent to kill." This assertion is incorrect.

The jury was instructed on the elements of murder with CALCRIM No. 520. In relevant part, CALCRIM No. 520 instructs that "[t]here are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder." (CALCRIM No. 520.) The instruction then explains that a defendant acts with express malice if he "unlawfully intended to kill." (CALCRIM No. 520.) A defendant acts with implied malice if he intentionally commits an act whose natural and probable consequences are dangerous to life and, at the time he

13.

acted, he knew his act was dangerous to human life and he deliberately acted with conscious disregard for human life. (CALCRIM No. 520.)

As previously explained, voluntary intoxication causing unconsciousness cannot negate a finding of implied malice in murder prosecutions. "'[E]vidence of voluntary intoxication is no longer admissible on the issue of implied malice aforethought.'" (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1114-1115.) Since appellant was prosecuted for second degree murder under an implied malice murder theory, the omitted instructions on intoxication would not have assisted the jury or affected the verdict. We reject the ineffective assistance of counsel claim on this basis.

### DISPOSITION

The judgment is affirmed.

_____
LEVY, Acting P.J.

WE CONCUR:


_____
DETJEN, J.


_____
FRANSON, J.

14.